## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| ex rel. KEITH SANDERS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMERICAN-AMICABLE LIFE | : | |
| INSURANCE COMPANY OF TEXAS, | : | |
| and CENTRAL NATIONAL BANK OF | : | |
| WACO, TEXAS, | : | NO. 03-4327 |
| Defendants. | : | |

## MEMORANDUM

PRATTER, DISTRICT JUDGE                                                    JULY 12, 2007

This action arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA").

Defendant American-Amicable Life Insurance Company of Texas ("American-Amicable") has

moved to dismiss plaintiff / relator Keith Sanders's (the "Relator") Amended Complaint pursuant

to Rule 12(b)(6) of the Federal Rules of Civil Procedure, while Defendant Central National Bank

of Waco, Texas ("Central") has moved to dismiss the Amended Complaint pursuant to Rule 9(b)

and Rule 12(b)(6). The Motions will be granted and Mr. Sanders shall be given leave to amend

his complaint in certain respects, all as outlined below.

### BACKGROUND

The Relator initiated this action on behalf of the United States and on his own behalf

under the qui tam provisions of the FCA. The Court of Appeals for the Seventh Circuit recently

accurately summarized the initial stages of a qui tam action under the FCA as follows:

> A qui tam action is brought by a private party, called the "relator," on behalf of
> the [United States]. If a qui tam suit under the False Claims Act succeeds, the
> relator obtains a reward of 25 to 30 percent of the judgment or settlement. 31
> U.S.C. § 3730(d)(2). The government gets the rest. Because the government thus

> has the primary stake in the suit, it is empowered to take it over and prosecute it itself.  The complaint is initially filed under seal and served only on the government, which then has 60 days in which to inform the district court that it plans to take over the prosecution of the suit. § 3730(b)(4).

United States ex rel. Lu v. Ou, 368 F.3d 773, 774 (7th Cir. 2004) (Posner, J.).  If the Government declines to intervene, a relator has "the right to conduct the action," subject to subsequent intervention by the United States, which a court may permit for good cause.  31 U.S.C. § 3730(b)(4)(B); § 3730(c)(3).

In this case, the United States declined to intervene, and the Relator, who is represented by counsel, has elected to conduct this action individually.  Following the United States' decision not to intervene, the Relator amended his complaint to add four new counts under state law in addition to three counts under the FCA.  The Relator's Amended Complaint was then served on the Defendants.  American-Amicable and Central filed their respective motions to dismiss shortly thereafter.  The United States, although not a party to this suit in the traditional sense, remains as the "party in interest" in a qui tam suit under the FCA, and submitted a Statement of Interest arguing that the Amended Complaint should be dismissed for failure to state a claim under the FCA.  The Court presided over oral arguments on the motions to dismiss on June 4, 2007.  For the reasons stated below, American-Amicable's Motion to Dismiss (Docket No. 33) will be granted, Central's Motion to Dismiss (Docket No. 34) will be granted, and the Relator's Amended Complaint will be dismissed in its entirety.  The Court will grant Mr. Sanders leave to further amend his complaint with respect to the state law claims.

## STANDARD OF REVIEW

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

the Court may look only to the facts alleged in the complaint and its attachments.  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1251, 1261 (3d Cir. 1994).  The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff.  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).  A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff.  Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).

DISCUSSION

I.      Outline of Relator's Amended Complaint

The Relator alleges that American-Amicable and Central sold life insurance policies to enlisted military personnel that were falsely marketed as "savings accounts."  American-Amicable and Central specifically seek members of the U.S. armed forces as customers, by placing advertisements and offering product promotions within close proximity to military bases. American-Amicable and Central arrange for the payments of premiums on these insurance policies through a system of automatic withdrawals from service members' military pay, known as an "allotment" system.

The Relator alleges that the Defendants represent to the United States that such allotments are for "savings," thereby inappropriately avoiding regulations designed to protect military personnel from false and misleading insurance practices.  In other words, service members' allotments that are directed to insurance companies are subject to various payment regulations, while allotments directed to a bank for "savings" are not.  The Relator alleges that the allotments at issue in this case are not actually for "savings," in that neither American-

3

Amicable nor Central establishes a savings account for each participating service member. Instead, the Relator argues that such withdrawals constitute payments of premiums for a term life insurance policy managed by American-Amicable. Hence, alleges the Relator, the allotment payments at issue should have been, but were not, subject to precautionary regulations.

The allotment procedure requires two steps. First, once a service member elects to participate in the "savings" program offered by American-Amicable, the Relator alleges that an American-Amicable agent completes one of two allotment forms on the service member's behalf, each of which functions as an "authorization to start, stop or change an allotment." Am. Compl. ¶ 42.[1] The allotment system permits the United States, as the service member's employer, to make direct payment of portions of salary or benefits directly to creditors, financial institutions, insurance companies or other approved payees. Id. ¶ 43.

Secondly, the Relator alleges that American-Amicable and Central submit or cause the service member to submit a false direct deposit form, which tells the United States to direct a specified portion of a service member's pay to Central. Id. ¶ 47. The Relator alleges that Central is merely a sham "pass through" entity. Because part of the alleged scheme involves the service members believing that they are contributing to a "savings" account instead of an insurance policy, the money diverted from each paycheck is initially deposited in an account at Central before being transferred to American-Amicable. Id. ¶ 45b-e. American-Amicable's name does not appear on either the allotment forms or the direct deposit forms that are submitted to the Government, while Central's name appears on both forms. The Relator alleges that the allotment

_____

[1] One form – the United Benefit Financial Services Process Verification Form – is used for non-U.S. Army service members, and the other form – DD Form 2558 – is used for U.S. Army service members. Am. Compl. ¶ 42.

and direct deposit forms submitted to the United States are false "claims" for payment for purposes of the FCA.

Relator's Amended Complaint alleges seven counts:  that American-Amicable and Central violated 31 U.S.C. § 3729(a)(1) (a false "claim" violation) (Count I); § 3729(a)(2) (a false statement violation) (Count II); § 3729(a)(3) (conspiracy) (Count III); that American-Amicable is liable for fraudulent inducement to contract (Count IV), nondisclosure (Count V), negligent misrepresentation (Count VI), and intentional misrepresentation (Count VII), with respect to the Relator's own employment by American-Amicable as an independent contractor for American-Amicable in Hawaii.[2]

## II.    The Allotment System

Congress first authorized military personnel to have deductions withheld from their pay and sent directly to another person or organization in 1889.  See U.S. Gen. Accounting Office, Comptroller General's Report to Congress, FGMSD-78-52; B-141025, The Payroll Allotment System Needs a Second Look 1 ( 1978).[3]  The allotment system was established at a time when most service members received their monthly pay in cash from their unit commanders.  See Dep't of Defense, Final Report: Insurance Solicitation Practices on Department of Defense Installations 39 (2000) [hereinafter Defense Report].  At that time, the allotment system was essential because the pay system was decentralized and few service members were on a check-to-

––––––––––––––––––––––––

[2] Central is not a defendant with respect to Counts IV through VII.

[3] In 1961, Congress authorized similar allotments for civilian federal employees. See Comptroller General's Report to Congress, U.S. Gen. Accounting Office, FGMSD-78-52; B-141025, The Payroll Allotment System Needs a Second Look 1 (1978); Pub. L. No. 87-304, § 5, 75 Stat. 663 (1961) (current version at 5 U.S.C. § 5525 (2001)).

bank pay system.  Id.   Under the current statute, Congress has authorized the Secretary of

Defense to prescribe regulations that permits a member of the Army, Navy, Air Force, or Marine

Corps to make allotments from his or her pay for the purpose of supporting relatives or for any

other purpose that the Secretary considers proper.  See 37 U.S.C. § 701(d).

Under the regulations, "allotment" is defined as a "definite portion of the pay and

allowances of a person in the Military Service, which is authorized to be paid to a qualified

allottee."  Dep't of Defense, Financial Management Reg. 7000.14-R, Vol. 7A, Definitions, at

xliv.  The allotment system works as an "above-the-line deduction, much like Social Security or

income tax payments, which will continue until formally revoked.  Accordingly, unless a formal

written communication is sent to the proper finance office or the service member is discharged,

the allotment will continue."  Defense Report 39.

The Department of Defense's regulations state that the "allotment system is provided to

help Military Service members adjust their personal and family finances to military service,"

which may include deployment to foreign countries or remote locations for extended periods of

time.  See Dep't of Defense, Financial Management Reg. 7000.14-R, Vol. 7A, ch. 41, at 41-4.

Use of the allotment system is "a convenience and privilege not to be exploited or abused."  Id.

Under the regulations, allotments are divided into two categories:  "discretionary" or

"non-discretionary."  Id. at 41-5.  "Discretionary" allotments include, for example, payment of

premiums for commercial life insurance on the life of the member, the member's spouse or

children, voluntary payment to a dependent or other relatives, or deposits to a financial

institution, mutual fund company, or investment firm.  Id.  Service members are restricted to no

more than six discretionary allotments.  See id. ch. 42, at 42-3.  "Non-discretionary allotments"

include voluntary liquidation of indebtedness to the United States, or an agency of the U.S. government, or payment for pledges for certain enumerated charitable contributions.  Id. ch. 41, at 41-5 to 41-6.

While commercial insurers are eligible allottees, all new allotments for paying premiums on commercial insurance must be approved under certain regulations, which differ for each of the branches of the U.S. miliary.  See id. ch. 42, at 42-5.  A main difference between allotments for commercial life insurance premiums and those for a savings account is that for service members below a specified pay grade, in order to obtain financial counseling, at least seven days must elapse between the signing of a life insurance application and the certification of a military pay allotment for any supplemental commercial life insurance.  32 C.F.R. pt. 50 app'x A(C)(2) (2006).  An allotment for a savings account, on the other hand, does not require a seven-day "cooling off" period.

According to a report presented to the Department of Defense, "there is no question that some insurance agents abuse the allotment system."  Defense Report 39.  In part, this is because the allotment system "ensures an uninterrupted stream of payments from the account of a service member to an insurance company without effective safeguards."  Id. 48. This "uninterrupted stream of payments is too attractive a target for unethical insurance practitioners."  Id.

## III.    The Relator's Claims Under the False Claims Act

The Relator alleges that both Defendants violated three separate provision of the False Claims Act, 31 U.S.C. § 3729(a)(1), (2) and (3).  Among other restrictions, section § 3729(a) makes any person liable who

(1) knowingly[4] presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a)(1)-(3).

A relator must prove a false "claim"[5] violation under Section 3729(a)(1) by proving that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 182 (3d Cir. 2001).

To establish a § 3729(a)(2) violation, known as a false statement violation, a relator must also prove "that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004).

Finally, to prove a claim under the FCA for conspiracy, pursuant to section 3729(a)(3), a relator must prove: "(1) that the defendant conspired with one or more persons to get a false or

---

[4] The statute defines "knowing" and "knowingly" as follows: "a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

[5] The statue defines a "claim" as including "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

fraudulent claim allowed or paid by the United States, and (2) that one or more conspirators performed any act to get a false or fraudulent claim allowed or paid." United States ex rel. Atkinson v. Pa. Shipbuilding Co., No. 94-7316, 2000 U.S. Dist. LEXIS 12081, at *27 (E.D. Pa. Aug. 24, 2000) (citations omitted).

In enacting the FCA, Congress's objective "'was broadly to protect the funds and property of the Government from fraudulent claims.'" United States ex rel. Watson v. Conn. Gen. Life Ins. Co., 87 F. App'x 257, 260 (3d Cir. 2004) (quoting Rainwater v. United States, 356 U.S. 590, 592 (1958); see also Hutchins, 253 F.3d at 184 ("The False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government."). Congress intended the False Claims Act "'to provide for restitution to the government of money taken from it by fraud.'" Hutchins, 253 F.3d at 184 (citing United States ex rel. Marcus v. Hess, 317 U.S. 537, 551).

However, the FCA "was not intended to impose liability for every false statement made to the government." Id. Even though an FCA claim "does not hinge upon the government suffering monetary damages, liability only attaches if a demand for money has been made on the government, the government 'has been billed for nonexistent or worthless goods, [or] charged exorbitant prices,' or the fraud might cause the government to suffer economic loss." United States ex rel. Watson v. Conn. Gen. Life Ins. Co., 87 F. App'x 257, 260 (3d Cir. 2004) (quoting Hutchins, 253 F.3d at 183) (internal quotations and citations omitted). As such, "'the proper inquiry under the False Claims Act is whether the defendant made fraudulent claims that caused or would cause economic loss to the United States Treasury.'" Id. (quoting Hutchins, 253 F.3d at 185). The Court of Appeals for the Third Circuit has noted aptly that interpreting the FCA to

9

create a cause of action based on any false statement made to the government, "regardless of any impact on the United States Treasury, would appear to impermissibly expand standing doctrine and essentially permit any plaintiff to sue on behalf of the government when false or misleading statements are made to any government agent including the courts, the legislature or any law enforcement officer." Hutchins, 253 F.3d at 184 n.5.

As a threshold matter, both Defendants argue that the Relator's Amended Complaint must be dismissed because the FCA extends only to false or fraudulent statements or claims which cause an economic injury to the United States Treasury, and that the Relator has not claimed that the United States has suffered any economic loss. The Defendants primarily rely on Hutchins, supra, and on United States ex rel. Bustamante v. United Way/Crusade of Mercy, Inc., No. 98-C-5551, 2000 U.S. Dist. LEXIS 7326 (N.D. Ill. May 26, 2000).

In Hutchins, the court of appeals considered whether submission of fraudulent legal bills for approval to the United States Bankruptcy Court violates the FCA. 253 F.3d at 179. The court concluded that it did not because that type of fraud did not cause economic loss to the government. Id. at 184. The court held that "the submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act." Id. Therefore, Hutchins established that in the Third Circuit, the relator must allege that the submission of false claims to the United States for payment must have the potential to cause economic loss to the federal government in order to state a claim under the FCA.

While the Hutchins decision establishes this baseline rule, and provides helpful guidance to the Court, the fact pattern in that case was quite different from the case at hand. However,

10

Bustamante presents a similar fact pattern.  The funds at issue in Bustamante, as in the instant case, were diverted from federal employees' pay to a third party through the federal payroll system.  As counsel for American-Amicable noted at oral argument on these motions, Bustamante concerned the exact same allotment system that is at issue in this case.

In Bustamante, the relator was an employee of United Way who discovered that United Way was improperly designating certain entities as eligible charitable organizations for purposes of receiving charitable contributions from federal employees through payroll deductions.  2000 U.S. Dist. LEXIS 7326, at *7.  United Way, as the manager of a federation of charitable organizations, was responsible for annually certifying to the government that certain agencies met federal requirements and were eligible to receive contributions from federal employees and military service members.  Id. at *5.  Once United Way certified that certain agencies were qualified, a list of qualified agencies was distributed to federal personnel and service members. Id.  From that list, the employees could chose a qualifying agency to which to voluntarily contribute a portion of their salary.  Id. at *5-6.  Of crucial importance to the court's holding in Bustamante, and to the instant case, after the federal employee chose the applicable organization and the amount of the contribution, a deduction was withheld from the federal employee's paycheck and distributed to the charity directly from a federal government payment center.  Id. at *6.  In other words, the federal employee created an allotment that directed the government, in its role as employer, to direct a portion of the employee's paycheck to a third party, namely, a charitable organization.

In Bustamante, the defendant moved to dismiss the relator's FCA claims pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction.  The court

granted the motion, holding that United Way did not present a "claim," as defined under the

FCA, to the United States, and that federal employees are not "recipients" of federal funds for

purposes of FCA jurisdiction.[6]  Like the instant case, the defendant in <u>Bustamante</u> argued that it

solicited federal employees to make personal donations, and that the money the employees chose

to donate was their own.  In other words, even though the federal government was the "payor,"

the funds at issue did not belong to the government.  Therefore, the defendant argued, it did not

receive federal funds, it received personal funds that were voluntarily contributed by each

participating federal employee.  The court agreed, stating that "although the federal government,

as the employer, is responsible for deducting the designated contribution from an employee's

paycheck, this does not convert the employee's personally paid charitable contribution into

federal money."  <u>Id.</u> at *15.  Further, the court noted that it would be "an illogical result if any

time a federal employee spent her federal wages, she was considered to be expending federal

funds and therefore protected from fraud by the FCA."  <u>Id.</u>  The court noted that the relator had

not cited, and the court did not discover, any legal authority to support the proposition that

federal employees are "recipients" of federal funds for purposes of the FCA.  <u>Id.</u> at *15-16.

Although the alleged "claims" at issue here are substantively different from <u>Bustamante</u> –

the claims in <u>Bustamante</u> concerned charitable contributions while the claims here concern

payments for life insurance under the guise of a savings account – the process for how the funds

flowed from the United Stated to the defendants is identical.  In both cases, the employee must

choose to make the subject payment.  In <u>Bustamante</u>, the employee chose to contribute "x"

dollars to "y" charity, while here the employee chose to participate in the insurance plan offered

---

[6] The Defendants in this case have not asserted a 12(b)(1) defense.

by American-Amicable, and direct "x" dollars as payment of life insurance premiums.  Once the employee makes that choice, he or she must complete the required "allotment" and "direct deposit" forms, and submit those forms to the government.  Thereafter, the United States will deduct the specified amount of money from the employee's paycheck and direct those fund to, in this case, the Defendants.

As a matter of pleading, for each of the FCA claims the Amended Complaint states that "the United States has been damaged in an amount that has yet to be determined but that is expected to be in the millions of dollars."  Am. Compl. ¶¶ 56, 59, 62.  However, the Relator does not explain how the United States has been damaged or suffered any financial loss.  Indeed, the Amended Complaint does not describe any process through which the United States actually expends federal funds with respect to any fraudulent claims, as opposed to merely depositing, in its role as employer, a portion of an employee's salary per that employee's direction.  The Amended Complaint specifies that each federal employee pays for the insurance policies through automatic withdrawals from his or her paychecks.  See Am. Compl. ¶ 2, 47.  The only paragraphs of the Amended Complaint that address the government's role as "payor" directly allege that as part of the scheme the Defendants "cause the United States to pay out funds in the mistaken belief that it is transferring funds to the service member's unrestricted savings account," id. ¶ 6, and that by submitting false forms for payment of insurance, the Defendants "execute a fraudulent scheme to obtain payments from the United States."  Id. ¶ 7.  The Relator attempts to bolster its argument that the United States has been harmed by the Defendants' conduct by arguing that the United States controlled the allotment program, the allegedly false claims are presented directly to the United States through the submission of allotment and direct deposit

forms, and the payments go directly from the federal Defense Financing and Accounting Service to the Defendants.

The Relator's arguments in this regard are unavailing.  The Relator's allegations ignore the fact that the United State is making such "payments" solely in its role as employer, and not in the role of, for example, a contractor or property owner.  Like the relator in <u>Bustamante</u>, the Relator here cannot show that there has been any damage, or any potential damage, to the federal Treasury.  <u>See</u> <u>Bustamante</u>, 2000 U.S. Dist. LEXIS 7326, at *15 ("No federal funds are used; only employee's personal funds are at issue.").  If a federal employee believes that he or she is contributing funds to a savings account, funds which will accumulate and will be available for the employee to withdraw and spend, then it is the employee who is suffering economic damage if such funds are actually submitted to American-Amicable as non-refundable payments of premiums on an insurance policy.  The federal Treasury has not been damaged, however, because whether a certain employee directs funds to American-Amicable, or not, or whether such funds are contributed for "savings" or for insurance premiums, the amount of total compensation the United States pays to the employee does not change.[7]  That the funds in question actually originate with the federal government, as the employer, is incidental.  If the military pay

---

[7] The Court notes that the circumstances might be different if, for example, the United States made a matching contribution to an employee's selected financial institution.  Imagine a scenario whereby the United States seeks to encourage service members to save or invest funds, and certain regulations provide that the United States, in its capacity as an employer, will make a matching dollar-for-dollar contribution for allotments directed to a "savings" account designated by the employee.  However, under these hypothetical regulations, the United States will not make a similar matching contribution for allotments for supplemental life insurance.  If, for example, a life insurance company marketed its life insurance products to service members as "savings" in order to exploit this system and receive a matching contribution from the United States, then there may be a valid argument that there has been economic damage to the United States fisc.

14

allotment system did not exist, each participating federal employee would be responsible for

paying American-Amicable directly, either by writing a check from the employee's personal

checking account, or perhaps by electronically transferring funds from the employee's account to

American-Amicable.  Liability under the FCA does not attach here merely because the United

States offers certain of its employees the privilege and convenience of the equivalent of a

federally-administered direct "deposit" system.

       Because the Relator cannot establish any actual or potential <u>economic</u>[8] loss to the federal

---

[8] The Relator states that "[t]he harm to the federal fisc is the improper diversion of monies to Defendants based upon fraudulent allotment and direct deposit forms."  Relator Opp'n 2.  The Relator further argues that a cause of action under the FCA exists even if monies transmitted are service member monies, because "Courts have consistently held that the source of the money sought to be fraudulently obtained from the United States is irrelevant if the monies are in the control of the United States and there has been a potential monetary loss to the United States." <u>Id.</u>  However, the Relator does not cite, and the Court has not found, any case supporting the Relator's position in the context of employees' pay.  The cases cited by the Relator hold that the FCA may apply when the United States collects, receives or controls monies on behalf of third parties, such as Native American tribes, or foreign countries.  For example, in <u>Kennard v. Comstock Res., Inc.</u>, 363 F.3d 1039, 1047 (10th Cir. 2004), the action was brought under Section 3729 (a)(7) of the FCA, which imposes liability upon "[a]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . . ." 31 U.S.C. § 3729(a)(7).  The court held that the text of the statute "broadly encompasses the fraud on the Government that occurs when a person or entity makes a false statement to the Government in order to decrease an obligation to transmit money to the Government." <u>Id.</u>  The court held that the transmission of funds to the Government sufficed for the purposes of establishing jurisdiction under the FCA, and that the statute did not require that the Government have an ongoing interest in the funds or that the Government itself suffer a loss. <u>Id.</u>  In that case, however, the key concept was that the funds in question were transmitted to the government and deposited in the United States Treasury.  The court distinguished claims under § 3729(a)(7) with claims under § 3729(a)(1), and specifically distinguished <u>Hutchins</u>, noting that § 3729(a)(7) does not require that a false "claim" be presented to the United States "for payment." <u>Kennard</u>, 363 F.3d at 1047 n.4.  Under § 3729(a)(7), the fraudulent act is seeking to transmit less money to the United States than the obligor actually owes, i.e., the obligor improperly seeks to "decrease an obligation to transmit money to the Government."

       In addition to monetary loss to the government, the Relator argues that the United States

government, its claims under the False Claims Act must fail.[9]  Therefore,  Counts I through III of

the Relator's Amended Complaint must be dismissed.[10]

## IV.    Relator's Common Law Claims

Finally, American-Amicable argues that the Relator's four state[11] common law claims

must be dismissed under Rule 12(b)(6) for failure to state a claim.[12]  Relator alleges that

---

has suffered damages to the integrity of the allotment program, the financial instability of service
members, and the morale and combat-readiness of members of the armed forces.  Relator Opp'n
at 3.  In light of the abundant case law that requires an economic injury to the United States in
order to state a cause of action under § 3729(a)(1), (2) and (3), these arguments are also
unavailing.  While the Court does not doubt that these proffered governmental and societal
interests are important, these are not the types of injuries that the FCA was intended to redress.

[9] The Relator also argues that the FCA applies to any person who makes a false statement
"with the purpose and effect of inducing the Government immediately to part with money."
United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).  The question presented in
Neifert-White was whether the FCA applies to the supplying of false information in support of a
loan application presented to a federal agency, the Commodity Credit Corporation.  Id. at 228-29.
The Supreme Court concluded that it did, and held that the FCA reaches "beyond 'claims' which
might be legally enforced, to all fraudulent  attempts to cause the Government to pay out sums of
money."  Id. at 233.  However, Neifert-White is distinguishable from the instant case because in
that case there was no doubt that the "payor" was a federal agency, operating in its capacity as a
lender, and lending federal funds to qualifying loan applicants.  In this case, however, the
"payor" is the federal employee who opts to participate in a commercial life insurance policy.

[10] Because the Court will dismiss the Relator's FCA claims based on the Defendants'
Rule 12(b)(6) argument, the Court need not address Central's Rule 9(b) argument.

[11] The parties agree, for purposes of American-Amicable's motion to dismiss, that
Pennsylvania law governs Mr. Sanders's common law claims.  June 4, 2007 Tr. 42:12-15; Pl.
Mem. Opp'n 25 n.9; Def. Mem. Supp. Mot. Dismiss 12 n.4.

[12] Because the Court will dismiss the Relator's claims under the FCA, federal question
jurisdiction pursuant to 28 U.S.C. § 1331 is no longer present.  However, diversity jurisdiction
pursuant to 32 U.S.C. § 1332(a) is arguably present because the Relator is a resident of Hawaii
and American-Amicable is a Texas corporation, and for present purposes the Court accepts that it
is feasible that the Relator seeks damages in excess of $75,000.  See Am. Compl. at 19 (seeking
"general, special and punitive damages in an amount to be proven at trial").

American-Amicable is liable for fraudulent inducement to contract (Count IV), nondisclosure

(Count V), negligent misrepresentation (Count VI), and intentional misrepresentation (Count

VII), with respect to Mr. Sanders's engagement as an independent contractor for American-

Amicable in Hawaii.  American-Amicable argues that these counts must all be dismissed because

the Relator does not allege that he personally suffered any cognizable injury as a result of the

alleged wrongdoing.

In his Amended Complaint, Mr. Sanders provides a thin 10-paragraph "summary" of his

state law claims.  See Am. Compl. ¶¶ 8-17.  He then recites the elements of each common law

cause of action, without making a single reference to any specific factual allegations underlying

his claims.  See generally id. ¶¶ 63-78.

Mr. Sanders states that in August 2001, American-Amicable offered him a position in

Hawaii as an independent contractor.  Id. ¶ 9.  Prior to that, he had worked intermittently for

American-Amicable during parts of 1996, 1997 and 1999.  Id.  Mr. Sanders alleges that he signed

a contract to work for American-Amicable under Ron Gatlin in August 2001, and later signed a

second contract to work under Kevin Beauralt, and a third contract to work under Mr. Beauralt

and Alexander Sias.  Id. ¶ 11.  The Amended Complaint does not specify precisely when Mr.

Sanders signed the second or third contracts.  Mr. Sanders alleges that American-Amicable fired

him in August 2002 after he complained about American-Amicable's allegedly improper

conduct.  Id.[13]  However, Mr. Sanders does not assert a retaliatory discharge claim.[14]  Instead, Mr.

---

[13] Mr. Sanders's Amended Complaint lacks any detailed explanation of his employment
arrangement.  For example, aside from stating that Mr. Sanders was an independent contractor,
the Amended Complaint does not explicitly state in what capacity American-Amicable employed
Mr. Sanders, i.e., what services was he contractually obligated to provide.  It appears that Mr.
Sanders may have been employed as an insurance agent, whose responsibility would include

Sanders claims that American-Amicable fraudulently induced him into accepting an employment opportunity by "failing to disclose a material fact that a reasonable person would want to know in entering a contract, i.e., that the company was requiring its independent contractors to engage in deceptive and illegal activity as a condition of working for the company." Id. ¶ 17.[15]

The Amended Complaint does not include any description of a single instance in which an officer, employee or agent of American-Amicable had a conversation with Mr. Sanders, prior to his agreeing to work for the company, in which they told, or failed to tell, him anything whatsoever about the nature of his work, his compensation arrangement, any conditions of employment, etc.  Although Mr. Sanders purports to bring four separate claims – nondisclosure, fraudulent inducement, negligent misrepresentation and intentional misrepresentation or fraud – the Amended Complaint is devoid of any allegation of an affirmative misrepresentation, either intentionally or negligently made to Mr. Sanders by an officer, employee or agent of American-Amicable.  It appears that all of Mr. Sanders's claims are premised upon a single alleged inaction or omission, namely, American-Amicable's "failure to disclose" described above.

---

selling various life insurance products.  See Am. Compl. ¶ 13.

[14] The Court notes that although the FCA contains a "whistleblower" provision, which protects an employee who has been retaliated against for participating in an "investigation . . . in an action filed or to be filed" pursuant to the FCA against his employer, Mr. Sanders has not brought claims under this provision.  31 U.S.C. § 3730(h).

[15] The gist of his claims is that American-Amicable is engaged in fraudulent and illegal insurance practices, and had he known this fact, he would not have agreed to work for it.  Oddly, however, the Amended Complaint states that "on or after August 2001" – the date he contracted to work for American-Amicable – "American Amicable devised a system to avoid military restrictions on insurance sales practices."  Am. Compl. ¶ 10.  Therefore, Mr. Sanders alleges that American-Amicable "devised" a fraudulent scheme after it hired him as an independent contractor.  If the fraudulent scheme was devised after Mr. Sanders was engaged, it is unclear, then, upon what basis American-Amicable fraudulently induced Mr. Sanders.

Federal Rule 8(a)(2) directs that a complaint must consist of a "short plain statement of the claim showing that the pleader is entitled to relief," yet notice pleading does not alleviate the need for some allegations of material fact.  See McCann v. Catholic Health Initiative,  No. 98-CV-1919, 1998 U.S. Dist. LEXIS 14011, at *5 (E.D. Pa. 1998).  In other words, simply restating the language of the statute or the elements of a common law cause of action is not enough.  Id.  A plaintiff must plead specific factual allegations and may not rely on either "bald assertions" or "vague and conclusory allegations."  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Se. Pa. Trans. Auth., 897 F. Supp. 893 (E.D. Pa. 1995).[16]

Accepting all well-pleaded allegations in the Amended Complaint as true, as the Court must, Mr. Sanders's Amended Complaint arguably describes, in the barest of details, some of the

---

[16] Furthermore, both Pennsylvania state law and federal law require that allegations of fraud be pleaded with particularity.  See Pa. R. Civ. P. 1019(b) ("Averments of fraud or mistake shall be averred with particularity."); Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").  The Third Circuit Court of Appeals has explained that a plaintiff must plead "all of the essential factual background that would accompany 'the first paragraph of any newspaper story' - that is, the 'who, what, when, where, and how' of the events at issue." In re Rockefeller Ctr. Props., Inc. Securities Litig., 311 F.3d 198, 216-217 (3d Cir. 2002) (quoting In re Burling Coat Factory Securities Litig., 114 F.3d 1410, 1422 (3d Cir. 1997)).  Further, the court of appeals described a plaintiff's obligation pursuant to Rule 9(b) as follows:

> In order to satisfy Rule 9(b), plaintiffs must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation.

Lum v. Bank of Am., 361 F.3d 217, 223-224 (3d Cir. 2004) (internal citations omitted).  Rule 9(b) does not apply to Mr. Sanders's negligent misrepresentation claims.  See TruePosition, Inc. v. Sunon, Inc., No. 05-3023, 2006 U.S. Dist. LEXIS 32918, at *13 (E.D. Pa. May 23, 2006).

factual basis underlying his nondisclosure claim.  See id. ¶ 17 ("American Amicable's actions violated Hawaii law by its fraudulent inducement to Mr. Sanders to enter into a contract with them for the sale of insurance and by failing to disclose a material fact that a reasonable person would want to know if entering a contract, i.e., that the company was requiring its independent contractors to engage in deceptive and illegal activity as a condition of working for the company.") (emphasis added).  However, Mr. Sanders's allegations are too bare to adequately state a claim.  Furthermore, Mr. Sanders's three remaining state law claims are woefully inadequate, in that the Amended Complaint provides no factual allegations to support these claims.

Although Mr. Sanders pleads the element of "damages" with respect to his various claims, including his nondisclosure claim, see, id. ¶ 69 (stating that Mr. Sanders "suffered damage" "as a result" of American-Amicable's nondisclosure), the Amended Complaint does not provide any factual allegations or circumstances that would support his claim for damages.[17]  See also id. ¶¶ 65, 73, 77 (pleading generally that Mr. Sanders has suffered damages as a result of American-Amicable's alleged fraud).  In short, the Amended Complaint makes no mention of any injury, however slight, that Mr. Sanders suffered as a result of his employment with American-Amicable.

---

[17] Under Pennsylvania law, fraud resulting from nondisclosure arises where there is an intentional concealment calculated to deceive, or where there is a nonprivileged failure to disclose.  Smith v. Renaut, 387 Pa. Super. 299, 306 (Pa. Super. Ct. 1989).  However, while a concealment may constitute fraud, mere silence is not sufficient in the absence of a duty to speak.  Id.  A party is liable for fraudulent concealment only when it had a duty to speak in the first place.  Jeter v. Brown & Williamson Tobacco Corp., 113 F. App'x 465, 469 (3d Cir. 2004) (unpublished) (citing Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 611-12 (3d Cir. 1995).  It is not clear under Pennsylvania law whether a "duty to speak" arises in the context of contract negotiations between an employer and a prospective employee.

For example, the Amended Complaint does not explain how (or whether) Mr. Sanders relied on such representations, how he was injured and what specific damages he seeks. The Amended Complaint does not allege, for example, that Mr. Sanders forewent other employment opportunities, undertook any expenses, or in any way changed his behavior in reliance upon American-Amicable's alleged misstatements. In his opposition to American-Amicable's motion to dismiss, Mr. Sanders avers that he is entitled to lost income from his previous position as well as out-of-pocket damages, which he suffered as a result of being fraudulently induced to leave his prior employer. Mr. Sanders's Amended Complaint, however, lacks a single reference to any prior positions Mr. Sanders may have held with any other employer (other than prior positions with American-Amicable), or which he may have left to move to Hawaii to work for American-Amicable in 2001.[18] Further, the Amended Complaint does not allege that Mr. Sanders incurred any out-of-pocket damages, or explain the nature or extent of any out-of-pocket damages, if any, that Mr. Sanders allegedly suffered. The Amended Complaint lacks any reference to Mr. Sanders's compensation arrangement with American-Amicable or any other employer.

In addition, as to the state law claims other than the nondisclosure claim, the Amended Complaint leaves too much to the imagination. The three remaining claims appear to be wholly subsumed by the one alleged act of "nondisclosure." Mr. Sanders claims that American-Amicable made an intentional "false representation of a material fact" in order to fraudulently induce him to accept an employment position, yet he describes no representation. Id. ¶¶ 64, 77.

---

[18] Apparently, Mr. Sanders was an independent contractor, not an employee of American-Amicable. In that regard, Mr. Sanders's Amended Complaint does not state whether his contract with American-Amicable was his only source of income, or whether it was one of many contracts with many employers or principals.

Further, Mr. Sanders claims that American-Amicable "supplied false information as a result of the failure to exercise reasonable care or competence in communicating the information," yet he does not describe what false information was provided, when it was provided, by whom, and to what end. Id. ¶ 73.[19]  Because Mr. Sanders's Amended Complaint does not provide sufficient

---

[19] Essentially, Mr. Sanders alleges that American-Amicable fraudulently induced him by failing to disclose that his activities in carrying out his employment responsibilities would be illegal, or by negative implication, that American-Amicable intentionally and/or negligently misrepresented to him that such activities would be legal.  However, the Amended Complaint is devoid of any affirmative representations.  It merely summarizes his intentional and negligent misrepresentation claims in one sentence stating "American-Amicable's conduct also constitutes intentional and negligent misrepresentation." Am. Compl. ¶ 17.

Under Pennsylvania law, fraudulent inducement requires: (1) a representation; (2) material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another to relying on the misrepresentation; (5) justifiable reliance on the misrepresentation; and (6) injury proximately caused by the reliance on the misrepresentation.  TruePosition, Inc. v. Sunon, Inc., No. 05-3023, 2006 U.S. Dist. LEXIS 32918, at *11-12 (E.D. Pa. May 23, 2006).  In order to prove a claim of intentional misrepresentation under Pennsylvania law, a plaintiff must prove: (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will be induced to act; (4) justifiable reliance on the misrepresentation; and (5) damage to the recipient as a proximate result.  Weisblatt v. Minnesota Mut. Life Ins. Co., 4 F. Supp. 2d 371, 384 (E.D. Pa. 1998) (citation omitted). In order to succeed on a claim of negligent misrepresentation under Pennsylvania law, plaintiff must prove five elements by a preponderance of the evidence: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity, or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. Weisblatt v. Minnesota Mut. Life Ins. Co., 4 F. Supp. 2d 371, 377 (E.D. Pa. 1998) (citing Gibbs v. Ernst, 538 Pa. 193, 209, 647 A.2d 882, 890 (1994) (citations omitted).  Negligent misrepresentation has essentially the same elements as fraudulent inducement but with a lesser scienter requirement. TruePosition, Inc., 2006 U.S. Dist. LEXIS 32918, at *14; see also Browne v. Maxfield, 663 F. Supp. 1193, 1202 (E.D. Pa. 1987) ("In sum, the elements that negligent and fraudulent misrepresentation have in common are false information, justifiable reliance, causation, and pecuniary loss.  The distinguishing elements are the state of mind of the person who supplied the information and the standard of proof that must be met by the plaintiff.").  In short, because Mr. Sanders's Amended Complaint does not contain a single allegation that American-Amicable made any affirmative misrepresentation, Mr. Sanders's fraudulent inducement, and

factual background to support his allegations of nondisclosure, fraudulent inducement, negligent misrepresentation and fraud, Counts IV through VII will be dismissed as well.

The Court will grant Mr. Sanders leave to endeavor to further amend his complaint to adequately plead his state law claims related to his employment with American-Amicable. The Court notes that, because Mr. Sanders's claims under the FCA will be dismissed, federal question jurisdiction no longer exists. Therefore, should Mr. Sanders choose to amend his complaint, his amended pleading must establish the basis for the Court's subject matter jurisdiction over this dispute, pursuant to 28 U.S.C. § 1332, or otherwise. Moreover, although the parties conceded that Pennsylvania law applied to Mr. Sanders's state law claims for the purpose of deciding the pending motions, the issue of venue will need to be considered as part of the process of determining whether and how to amend this claim. Because no party in this case appears to reside in Pennsylvania, no action underlying Mr. Sanders's claims seems to have occurred in Pennsylvania, and Pennsylvania would appear to have no stake in the outcome of this litigation, it will be incumbent upon the Plaintiff in the first instance to explain why the Court should continue to entertain Mr. Sanders's state law claims. Because neither party has raised the issues of jurisdiction or venue, the Court will not address either of those issues at this time.

---

misrepresentation claims are inadequately pleaded.

**CONCLUSION**

For the reasons stated above, Mr. Sanders's Amended Complaint will be dismissed in its entirety. The Court will grant Mr. Sanders leave to further amend his complaint to adequately plead his state law claims.

<u>S/Gene E.K. Pratter</u>
Gene E.K. Pratter
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **ex rel. KEITH SANDERS,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **AMERICAN-AMICABLE LIFE** | : | |
| **INSURANCE COMPANY OF TEXAS,** | : | |
| **and CENTRAL NATIONAL BANK OF** | : | |
| **WACO, TEXAS,** | : | **NO. 03-4327** |
| Defendants. | : | |

**ORDER**

AND NOW, this 12th day of July, 2007, upon consideration of American-Amicable's

Motion to Dismiss (Docket No. 33), Plaintiff's response thereto (Docket No. 36), and American

Amicable's Reply brief (Docket No. 39), and Central National Bank's Motion to Dismiss

(Docket No. 34), Plaintiff's response thereto (Docket No. 35), and Central National Bank's

Reply brief (Docket No. 38), **IT IS ORDERED** that (1) American-Amicable's Motion to

Dismiss (Docket No. 33) and (2) Central National Bank's Motion to Dismiss (Docket No. 34) are

**GRANTED**, and the Plaintiff's First Amended Complaint (Docket No. 19) is **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiff shall have twenty (20) days from the date of

this Order to amend his complaint with respect to the state law claims.  If Plaintiff elects not to

amend his complaint within this time frame, this action will be marked closed for all purposes.


BY THE COURT:


S/Gene E.K. Pratter
GENE E. K. PRATTER
UNITED STATES DISTRICT JUDGE